**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LIBERTY POWER CORP., LLC | CIV. ACTION NO.: |
| Plaintiff, | COMPLAINT |
| v. | |
| STUART KATZ, STUART A. KATZ, INC., AND FOUNDATION ENERGY SERVICES, LLC, | |
| Defendants. | |

10 1938
GARAUFIS, J.   POLLAK, M.J.

For its Complaint against Defendants Stuart Katz ("Katz"), Stuart A. Katz, Inc. ("SAK") and Foundation Energy Services, LLC ("FES") (collectively "Defendants"), Plaintiff Liberty Power Corp., LLC ("Liberty Power") alleges on personal knowledge as to its own activities and on information and belief as to the activities of others as follows:

### PARTIES

1. Plaintiff Liberty Power is a limited liability company under the laws of the State of Delaware, with its principal place of business located at 1901 W. Cypress Creek Rd., Suite 600, Fort Lauderdale, FL 33309.

2. Defendant Katz is an individual who conducts business at 161-36 95th St., Howard Beach, NY 11414.

3. Defendant SAK is a company in New York with its principal place of business at 161-36 95th St., Howard Beach, NY 11414.

4. Defendant FES is a corporation in New York with its principal place of business at 380 Lexington Avenue, 17th Floor, New York, NY 10168.

### JURISDICTION AND VENUE

5. This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and because Plaintiff's damages exceed $75,000.

6.  Defendants are subject to personal jurisdiction in this Court because they reside in the State of New York.

7.  Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims herein occurred in this District, and because Defendants reside in this District.

## BACKGROUND FACTS

### A. Liberty Power's Business Model and Customers

8.  David Hernandez, Eliezer Hernandez and Alberto Daire founded Liberty Power in 2001 to provide affordable electricity, customized energy solutions and superior customer service to customers ranging from small companies to multinational businesses to local, state and federal governments.

9.  Traditionally, electric power is generated, distributed and sold by a local electric utility, i.e. a monopolized, regulated market. Certain states, however, have deregulated the market on the premise that customers' electric costs can be reduced if electricity wholesalers and retailers are able to compete with local utilities. Liberty Power is currently licensed to sell electric power in sixteen such deregulated states, and actively sells electric power to commercial customers in twelve states.

10. Liberty Power purchases electric power on the wholesale market and sells that power to retail customers. Liberty Power generates revenue through both its own direct sales force and through third party brokers.

11. Liberty Power's direct sales force primarily targets large commercial and industrial companies throughout the deregulated states, such as IBM, JC Penney and Walmart.

12. Liberty Power separately contracts with independently operated brokers, or "Sales Channels" as they are referred to in the industry, to sell to small-medium size commercial and residential customers. Liberty Power's relationships with its Sales Channels are crucial to Liberty Power's business.

13. Liberty Power assigns a Sales Channel Support representative to work with its Sales Channels, who serves as the primary point of contact between Liberty Power and the Sales Channel. Each end-customer referred by a Sales Channel enters into a contract with Liberty Power and becomes Liberty Power's direct customer. The Sales Channel is paid a commission for each account that it brings to Liberty Power. Liberty Power's Sales Channels remain in touch with the end-customers that they develop and are responsible for renewing the customers' contracts with Liberty Power upon expiration.

14. Liberty Power is committed not just to growing its own business, but to serving as a responsible and proactive member of the business community. In 2007, Hispanic Business Magazine named Liberty Power the Fastest Growing Hispanic Business in the United States. Liberty Power maintains an intense commitment to fostering diversity throughout its operation, and is a member of the National Minority Supplier Development Council, the NY/NJ Minority Supplier Development Council, the Maryland/District of Columbia Minority Supplier Development Council, the United States Hispanic Chamber of Commerce, the Dallas Hispanic Chamber of Commerce, the Houston Minority Business Council, the Dallas/Ft. Worth Minority Business Council and the Florida Regional Minority Business Council. Liberty Power also sponsors numerous events that foster economic empowerment in under-represented segments of the population.

### B. Liberty Power's Proprietary Information

15. Liberty Power does not own generation, transmission or distribution facilities; instead, Liberty Power generates revenue by buying energy from wholesalers and selling it to end-customers. Consequently, the company's most valuable assets are its customer lists, customer data and customer contracts. Liberty Power maintains detailed customer information, including but not limited to:

- specific contact information for individual contacts at its customers;
- customers' order history information;
- the rates paid by its customers;

- product type information, e.g. whether the customer has previously purchased a fixed price, variable price or index price product, or purchased other complex product structures;
- customers' upcoming renewal dates; and
- data regarding the customer's annual electricity consumption.

(collectively, the "Proprietary Information"). Liberty Power compiles this Proprietary Information for all of its tens of thousands of customers. Liberty Power's Proprietary Information is the result of years of time, effort and resource-expenditure, all driven by the goal of developing long-lasting customer relationships wherein Liberty Power can use its Proprietary Information to provide its customers with the best possible electricity rates and customer service.

16. Liberty Power takes a variety of steps to ensure that its Proprietary Information remains confidential. Each of Liberty Power's employees signs a nondisclosure agreement by which the employee is bound to maintain the confidentiality of all Proprietary Information.

17. Liberty Power also maintains a "data classification policy". Pursuant to this policy, data is separated into one of three categories: public, confidential and highly confidential. Confidential and highly confidential information - which include the Proprietary Information at issue in this lawsuit - are provided to employees on a "need-to-know" basis. The data classification policy applies throughout the life cycle of Liberty Power's Proprietary Information, from the data's creation to destruction, and applies to data in both physical and electronic form.

18. Employees are further assigned user accounts and abide by a "user account policy". Each employee whose job responsibilities include the use of Liberty Power's Proprietary Information is assigned one or more unique user accounts that control access privileges.

19. Employees' accounts are password protected, and employees are expressly forbidden from using user accounts not assigned to them. Liberty Power restricts and controls the allocation of privilege rights, such as administrator accounts, and authorization for such

privileges requires written approval. Access for remote users is subject to authorization, and no uncontrolled external access is permitted to any network device or networked system. Connections to remote systems must be authenticated by Liberty Power's information technology team to establish the identity and authenticity of remote systems. Liberty Power implements routing controls to ensure that computer connections and information flows do not breach its access control policy.

20.  Similarly, Liberty Power's Sales Channels sign nondisclosure agreements precluding their use of Liberty Power's Proprietary Information for any purpose other than in connection with their work for Liberty Power. Liberty Power's Sales Channels are also given passwords that allow them to access Liberty Power's Proprietary Information only as to those customers with whom the Sales Channels work, but not as to other customers handled by Liberty Power's direct sales force or by other Sales Channels.

### C.   **Liberty Power's Relationship With Defendants**

21.  On September 19, 2007, Liberty Power signed a broker agreement with SAK, owned by Katz (the "Broker Agreement"). On May 10, 2009, Liberty Power executed an Independent Telesales Contractor Agreement with Foundation Energy Services ("FES"), owned by Katz (the "Contractor Agreement").

22.  According to the Broker and Contractor Agreements, Liberty Power pays SAK and FES a commission at a rate dependent upon the actual electric consumption of the customers that SAK and FES refer to Liberty. Liberty Power has paid substantial commissions to SAK and FES.

23.  Both the Broker Agreement and the Contractor Agreement require SAK and FES to maintain the confidentiality of all of Liberty Power's Proprietary Information and not to misuse any such information.

24.  The Broker Agreement defines "confidential information" to include any customer information "regardless of form, that is associated with any identifiable Retailer and/or Broker customer".

25. The Contractor Agreement states that "the names and addresses of Liberty's customers constitute trade secrets of Liberty and that the sale or unauthorized use or disclosure of any of Liberty's trade secrets obtained by [FES] during the term of this Agreement constitutes unfair competition." The Contractor Agreement also provides that "monetary damages may be inadequate to compensate Liberty for breach of [the] confidentiality obligation." Pursuant to the Contractor Agreement, FES specifically agreed "not to engage in any unfair competition with Liberty."

26. In addition to the confidentiality provisions in the Broker and Contractor Agreements, Katz signed a "Code of Ethics" and "Code of Conduct" with Liberty Power on behalf of SAK.

27. Pursuant to the Code of Ethics, Katz agreed that SAK and its employees would not pursue customers other than those permitted by Liberty Power and would not engage in fraudulent, unfair, misleading deception or anti-competitive activities in marketing Liberty Power's products.

28. Pursuant to the Code of Conduct, Katz personally agreed, among other things, that he would truthfully identify himself to customers, would not make any representations regarding contracts, rights or obligations other than those contained in the customers' agreements, would not place undue pressure on prospective customers, and would not knowingly divulge any information about Liberty Power's products, leads or business practices.

### D. Defendants' Intentional Misappropriation of Liberty Power's Proprietary Information

29. Notwithstanding their contractual and common law obligations to Liberty Power, Defendants Katz, SAK and FES began to misappropriate Liberty Power's Proprietary Information in fall 2008 through two of Liberty Power's employees, first Keith Hernandez ("Hernandez") and then Yamil Moya ("Moya").

30. Liberty Power had assigned Hernandez to serve as the Sales Channel Support representative for SAK and FES. During Hernandez's time as SAK and FES' Sales Channel

Support representative, Katz asked Hernandez to go into business with him, offering to both pay Hernandez and give Hernandez equity in FES in exchange for the delivery of Proprietary Information about at least 30,000 customers. Initially, Katz and Hernandez did not come to an agreement.

31. In August 2008, Liberty Power transferred Hernandez from Sales Channel Support to collections; as a result, Hernandez would no longer be Katz's primary contact at Liberty Power. Hernandez called Katz to inform him of the move, and Katz again told Hernandez that he would be interested in information about Liberty Power's customers. Hernandez told Katz that he would be interested in providing Katz with information about Liberty Power's customers for the right price.

32. Although Hernandez is the nephew of David Hernandez, the co-founder and CEO of Liberty Power, Hernandez has struggled with addiction and financial problems. Hernandez viewed the move to collections as a demotion, and was upset with Liberty Power as a result. Accordingly, Katz and Hernandez negotiated a price to be paid by Katz to Hernandez out of Katz's commission from Liberty Power.

33. After agreeing on a price, Hernandez compiled various Proprietary Information and sent it to Katz. Initially, Hernandez provided Proprietary Information but excluded the largest accounts, national accounts, and deals originally closed by Liberty Power's largest sales channels in order to avoid detection by Liberty Power. Beginning in fall 2008, Katz, SAK and FES signed other Sales Channels' customers to new contracts with Liberty Power by using the Proprietary Information delivered by Hernandez, and Hernandez submitted commission requests to Katz.

34. Hernandez continued sending Liberty Power's Proprietary Information to Katz about hundreds of accounts at various points in 2009, and continued to receive payment from Katz.

35. In summer 2009, while unaware of Hernandez's arrangement with Katz, Liberty Power terminated Hernandez due to performance problems. With his access to Liberty Power's

Proprietary Information coming to an end, Hernandez hand-delivered a USB drive to Katz that contained Proprietary Information about approximately 1,500 Liberty Power's customers whose contracts were set to expire through June 2012.

36. Katz continued to close deals for Liberty Power customers associated with other Sales Channels into fall 2009 based on Proprietary Information that he had previously misappropriated.

37. In fall 2009, Hernandez and Katz discussed whether Hernandez should approach another Liberty Power employee to send additional Proprietary Information since the leads based on the Proprietary Information that Hernandez had sent to Katz were drying up. Hernandez suggested that they approach Moya, who is Hernandez's cousin and was employed at Liberty Power as a sales representative, which Katz encouraged and supported. Pursuant to his discussions with Katz, Hernandez approached Moya about taking over Hernandez's role in passing Proprietary Information to SAK and FES.

38. On January 15, 2010, Katz hired Hernandez to work at FES. Hernandez and Moya then came to an agreement for Moya to provide Proprietary Information to Katz, SAK and FES. On January 19, 2010, Moya sent Hernandez his password so that Hernandez - now employed by FES - could access Liberty Power's Proprietary Information to ensure that the information he had previously provided to Katz was up to date. In addition, on January 22, 2010, Moya sent (1) Proprietary Information about customers up for renewal between March and May 2010 and (2) a customer's contract to Hernandez. On January 27, 2010, Moya sent Proprietary Information about another customer to Hernandez. Hernandez passed all of this information to Katz.

39. Moya also gave Hernandez a USB drive that contained Proprietary Information about Liberty Power accounts whose contracts were set to expire from February 2010 to June 2010. Hernandez modified the list to remove the large accounts, deals closed by Liberty Power's larger channels, and national accounts, again to avoid detection by Liberty Power, and provided

the remaining Proprietary Information to Katz for customers that were up for renewal between February and April 2010.

40. On February 16, 2010, Moya sent further Proprietary Information to Hernandez. Moya also gave Hernandez a USB drive that contained Proprietary Information about customer accounts that were set to renew between March 1 and July 1, 2010. From these files, Hernandez emailed Katz Proprietary Information regarding approximately 475 accounts.

41. Also in February 2010, Hernandez visited Katz during a trip to New York at which time Katz paid Hernandez $12,000 for deals closed by SAK and FES using Liberty Power's Proprietary Information from approximately August 2009 to January 2010.

42. In March 2010, Liberty Power changed the manner in which it paid commissions to its Sales Channels. Historically, Liberty Power paid its Sales Channels at the outset of a customer contract based on that customer's expected electricity usage. Liberty Power would then reconcile its payments with the Sales Channel on the expiration of the contract to account for any further commissions owed to the Sales Channel or any chargeback owed by the Sales Channel to Liberty Power. Beginning in March, Liberty Power adopted a new policy whereby it paid commissions to its Sales Channels at the end of each month based on the customer's actual electricity consumption during the prior month.

43. Katz called Hernandez and told him that he was very angry that Liberty Power had changed its payment policy for Sales Channels. Katz told Hernandez that Liberty Power's change in policy would hurt his business and could possibly force him to close his doors. Katz then informed Hernandez that he wanted to take Liberty Power customers to other electricity providers, i.e. Liberty Power's competitors. Katz further stated that he wanted to not only take customers whose contracts were expiring to Liberty Power's competitors, but also wanted to take customers in the middle of their contracts because, in his experience, Liberty Power did not enforce termination penalties.

44. The total potential renewal value of the customer contracts about which Hernandez and Moya delivered Proprietary Information to Defendants is in the hundreds of

millions of dollars. To date, SAK and FES have consummated nearly ten million dollars worth of deals using Liberty Power's Proprietary Information.

45. Katz paid Hernandez approximately $40,000 for the Proprietary Information that he delivered to Defendants. Among other instances, on January 19, 2010, just four days after FES hired Hernandez, Hernandez sent Katz a request for commissions for Proprietary Information provided from September to November 2009, confirming that Katz was paying Hernandez for the delivery of Liberty Power's Proprietary Information, not for legitimate work done at FES.

## FIRST CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

46. Liberty Power repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

47. Liberty Power has expended considerable time, effort, and money developing its trade secrets, including but not limited to the Proprietary Information.

48. Liberty Power has undertaken efforts to ensure that its Proprietary Information is kept secret and not generally known to the public.

49. Defendants, by way of their relationships with Liberty Power, were subject to confidentiality agreements, and through such agreements agreed not to divulge or appropriate to their own use or to the use of others any of Liberty Power's Proprietary Information.

50. Because of their relationship with Liberty Power, as well as their access to Liberty Power's trusted employees, Defendants had access to Liberty Power's Proprietary Information, and misappropriated that Proprietary Information.

51. Despite Liberty Power's safeguards, and without Liberty Power's consent, Defendants misappropriated and used Liberty Power's Proprietary Information.

52. Defendants had a reason to know and did know at and/or after the time that they misappropriated and/or used Liberty Power's Proprietary Information, that the Proprietary

Information belonged to Liberty Power and that Defendants owed a duty to Liberty Power not to misappropriate it or destroy its secrecy.

53. As a result of Defendants' violations, Liberty Power has suffered and continues to suffer irreparable harm to its Proprietary Information, its relationships with other Sales Channels and its ability to compete in the market. Liberty Power has no adequate remedy at law for Defendants' acts described herein.

## SECOND CLAIM FOR RELIEF

### (Common Law Unfair Competition)

54. Liberty Power repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

55. By misappropriating the commercial advantage gained by Liberty Power in the Proprietary Information, Defendants have competed unfairly in violation of the common law of New York.

56. As a result of Defendants' violations, Liberty Power has suffered and continues to suffer irreparable harm to its Proprietary Information, its relationships with other Sales Channels its ability to compete in the market. Liberty Power has no adequate remedy at law for Defendants' acts described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court:

1. Enter an Order that preliminarily and permanently enjoins Defendants, and all persons acting on their behalf and/or in concert with them, from:

   a. committing any acts of trade secret misappropriation or unfair competition, including but not limited to the further misappropriation and/or use of Liberty Power's Proprietary Information; and

   b. unfairly competing with Liberty Power in any manner whatsoever, including but not limited to further misappropriation and/or use of Liberty Power's Proprietary Information.

107,661,618                          11

2. Enter an Order requiring that Defendants, within 5 days from the date of the Order:

   a. identify in writing all employees of Defendants to whom Defendants provided Proprietary Information or access to Proprietary Information;

   b. collect and return to Liberty Power all Proprietary Information in Defendants' possession, custody or control, including in both electronic and physical form, and including but not limited to from all persons identified pursuant to Paragraph (2)(a) above;

   c. provide a certification, under oath, that describes in detail the steps that Defendants have taken to identify, collect and return to Liberty Power all Proprietary Information in Defendants' possession, custody or control;

   d. identify and contact all persons other than Defendants' employees, including both individuals and corporate entities (the "Third Parties"), to whom Defendants provided any Proprietary Information or access to the Proprietary Information, provide them with a copy of the Order, collect all Proprietary Information in the Third Parties' possession, custody or control, including in both electronic and physical form, and return the Proprietary Information to Liberty Power;

   e. provide a certification, under oath, that (i) identifies all of the Third Parties to whom Defendants provided Proprietary Information or access to Proprietary Information and (ii) describes in detail the steps undertaken by Defendants to identify, collect and return all Proprietary Information, including in both electronic and physical form, in such Third Parties' possession, custody or control; and

   f. retain, at Defendants' cost, a reputable third-party forensic computer firm to confirm that all electronic copies of the Proprietary Information have been fully removed from all computer servers, systems, programs, CDs,

      DVDs, floppy discs and any other electronic storage medium in

      Defendants' possession, custody or control, and provide a certification

      under oath from such computer firm.

  3.  Award Liberty Power its reasonable attorneys' fees and costs; and

  4.  Award such other and further relief as this Court deems equitable and just.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: April 29, 2010      Respectfully submitted,

              _/s/ David Saenz_
              David Saenz (DS 1976)
              Heidi Garfield (HG 4224)
              GREENBERG TRAURIG LLP
              200 Park Avenue
              New York, NY 10166
              Telephone: 212-801-6930
              Facsimile: 212-801-6400

              Attorneys for Plaintiff Liberty Power Corp., LLC