UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

LIBERTY POWER CORP., LLC,

                                         Plaintiff,

          -against-

STUART KATZ, STUART A. KATZ, INC.,
and FOUNDATION ENERGY SERVICES,
LLC,

                                        Defendants.

**MEMORANDUM & ORDER**

**10-CV-1938 (NGG) (CLP)**

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Liberty Power Corporation, LLC ("Plaintiff" or "LPC") moves for a preliminary injunction to protect it from the irreparable harm it believes it will suffer if Defendants Stuart Katz ("Katz"), Stuart A. Katz, Inc. ("SAK"), and Foundation Energy Services, LLC ("FES") (collectively, "Defendants"), are allowed to use its proprietary information to solicit its customers. For the following reasons, LPC's motion is denied.

**I.    BACKGROUND**

LPC is a supplier of electricity to businesses in several states with deregulated energy markets, including New York. (Sealed Decl. of David Hernandez of Apr. 29, 2010 ("DH Decl.") ¶ 2.) LPC solicits large businesses to become customers using its own in-house sales staff, but depends on independent contractors or brokers, which it calls "sales channels," to solicit small to medium-sized businesses and residential customers. (Id. ¶ 3.) In order to become an LPC sales channel, a broker or contractor enters into a contract with LPC. (Id.) When a sales channel locates a customer interested in obtaining electricity from LPC it refers the customer to LPC, which enters into an electricity supply agreement directly with the customer. (DH Decl. ¶ 4.)

1

The sales channel receives a commission based on the electricity usage of customers it refers to LPC, and is responsible for renewing the customer's contract with LPC upon expiration. (Id.)

Defendants SAK and FES, both apparently owned by Defendant Katz,[1] were each sales channels of LPC from 2006 through April 2010, and 2008 through April 2010, respectively. (See Katz Aff. of Sept. 29, 2010 ("Katz Aff.") (Docket Entry # 32-2) ¶¶ 1, 5-8.) The relationship between SAK and LPC was not exclusive—LPC was free to contract with other sales channels to solicit the same customers in the same geographic regions, and SAK was free to solicit customers for other suppliers. (See DH Decl. Ex. A (the "SAK Contract") § 2.07.) However, the relationship between FES and LPC was more restrictive. LPC was free to contract with other sales channels (DH Decl. Ex. B (the "FES Contract") § 3.03), but FES promised not to compete with LPC "in any manner whatsoever" (id. § 7.04), and promised LPC "a right of first refusal and a last look" with respect to sales to particular customers (id. App'x A ¶ 3).

LPC's contracts with SAK and FES protected the confidentiality of LPC's customer information, though they did so in different ways. (Compare SAK Contract § 4 with FES Contract §§ 7.01-7.03.) Katz also signed a "Code of Ethics for Channel Partners," and a "Code of Conduct for Energy Sales Representatives" in which he promised to "not knowingly divulge any information about LPC's products, leads, or any other business practices . . . ." (DH Decl. Ex. C.) In addition to the contract terms between LPC and its sales channels, LPC asserts that it enforced a "data classification policy" which restricted its own employees' access to customer information on a "need-to-know" basis. (DH Decl. ¶ 7.)

---

[1] The docket reflects that Defendants SAK and FES have failed to file the disclosure statements required by Federal Rule of Civil Procedure 7.1. Defendants SAK and FES shall file the disclosure statements required by Rule 7.1 by February 4, 2011.

2

## II. DISCUSSION

### A. Legal Standard

"A party seeking a preliminary injunction must demonstrate: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." Faiveley Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 116 (2d Cir. 2009) (internal quotation marks omitted). In performing this analysis courts must be mindful that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 377 (2008).

### B. Probability of Success on the Merits

Plaintiff's Complaint alleges theories of both misappropriation of trade secrets and unfair competition (Compl. ¶¶ 46-56); however, it is clear that Plaintiff bases its claim to preliminary injunctive relief on the risk that Defendants will further misappropriate its trade secrets (Pl.'s Sealed Mem. of May 7, 2010 ("Pl.'s Mem.") at 14). Accordingly, LPC is not entitled to preliminary relief prohibiting the misappropriation of trade secrets unless it demonstrates that Defendants likely misappropriated a trade secret. Faiveley, 559 F.3d at 116-17. "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999).

#### 1. LPC's Customer-Specific Information as Trade Secrets

"'A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over

competitors who do not know or use it.'" Faiveley, 559 F.3d at 117 (quoting N. Atl. Instruments, 188 F.3d at 44). "In determining whether information constitutes a trade secret, New York courts have considered:

> '(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'"

Id. (quoting N. Atl. Instruments, 188 F.3d at 44).

In applying this standard, New York courts have refused to protect customer lists as trade secrets "where the customers are readily ascertainable outside the [plaintiff's] business as prospective users or consumers of the [plaintiff's] services or products . . . ." Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 392 (1972). In Leo Silfen the New York Court of Appeals refused to enjoin an employee from soliciting his former employer's customers where the solicitation was the product of the employee's "casual memory" rather than "a physical taking or studied copying" of the employer's customer list, and found that a "customer list, exclusive of the recorded detail about each customer" did not qualify as a trade secret. Id. at 391-92. However, in other cases New York courts have distinguished customer lists in determining that customer-specific data such as pricing arrangements and contract renewal dates constituted trade secrets. See Compsolve, Inc. v. Neighbor, No. 681/06, 2007 WL 4442412, at *5 (N.Y. Sup. Ct. Dec. 19, 2007) (holding "renewal dates and existing contract rates for plaintiff's existing customers" to be trade secrets); Inflight Newspapers, Inc. v. Magazines In-Flight, LLC, 990 F. Supp. 119, 126-28 (E.D.N.Y. 1997) (Seybert, J.) (holding terms of proposals to and contracts with potential and existing customers to be trade secrets).

4

Plaintiff asserts that the following customer-specific information constitute trade secrets: (1) specific contact information for individual contacts at Plaintiff's customers; (2) Plaintiff's customers' order history information; (3) the rates paid by Plaintiff's customers; (4) product type information, *e.g.*, whether the customer has previously purchased from Plaintiff a fixed price, variable price or index price product, or purchased other complex product structures from Plaintiff; (5) Plaintiff's customers' contract renewal dates; and (6) data regarding Plaintiff's customers' annual electricity consumption. (DH Decl. ¶ 6.) Defendants contend that this information can be obtained from the customers themselves and is the type of information that can be acquired from a commercially available sales lead list. (Def.'s Mem. (Docket Entry # 32) at 14-15.) Thus, Defendants argue that this information is readily ascertainable and not entitled to trade secret protection. (Id.)

Plaintiff is likely to be able to establish that the six categories of customer-specific information listed above are trade secrets. First, LPC accumulated this information over a long period of time and through a significant investment of resources. The information is specific to LPC's existing or former customers and was obtained only by separately entering into contracts with each of its customers. Second, this information has significant value to LPC because it provides information relevant to assessing the value of a particular customer's business, and to the customer's needs and preferences. Furthermore, this information, if revealed, would allow competitors to easily undercut LPC's prices and steal customers. In recognition of the value of this information LPC has implemented information security protocols which control its own employees' access to the information internally (see Sealed Decl. of Carlos Covarrubias of Apr. 23, 2010; Decl. of Elie Hernandez (Docket Entry # 33-2) ¶ 7), and has specifically contracted with its sales channels to preserve the confidentiality of this information (see DH Decl. ¶¶ 7-8).

5

Moreover, this information is not readily ascertainable. Defendants argue that, theoretically, they could obtain this information by individually contacting LPC's customers and persuading them to reveal the terms of their contracts with LPC and their electricity supply needs and preferences. (Def.'s Mem. at 15.) But doing so would not be easy. Without knowing the identities of LPC's customers in advance, Defendants could only obtain this customer-specific information by cold-calling LPC's potential customers using phone books and commercial lead lists. (See Katz Aff. ¶¶ 10-15.) LPC's potential customers are every business in the twelve deregulated states in which it actively sells electricity (DH Decl. ¶ 2), and Katz acknowledges the vast market in which LPC and Defendants operate (Katz Aff. ¶ 9 ("The universe of prospective customers for SAK/FES is literally any and all businesses in a deregulated state in which SAK/FES are authorized to do business.").) Thus, even identifying LPC's customers would require cold-calling potentially hundreds of thousands of businesses. Once Defendants identified an LPC customer, Katz admits that Defendants could only obtain the information by persuading the customer to voluntarily provide it to them. (Def.'s Mem. at 15.) Therefore, according to Defendants, independently obtaining this information from LPC's customers would require a Herculean effort by an army of improbably persuasive telemarketers. Defendants' argument that this information is reasonably ascertainable is simply unrealistic.

    2.   <u>Misappropriation</u>

There is considerable evidence that Defendants obtained LPC's trade secrets "in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." <u>Faiveley</u>, 559 F.3d at 117. Keith Hernandez was originally the LPC sales channel support representative for SAK and FES, *i.e.*, the LPC employee charged with maintaining LPC's relationships with Defendants. (Sealed Decl. of Keith Hernandez of Apr. 29, 2010 ("KH

Decl.") ¶ 2.) Keith Hernandez states that while he was employed with LPC, Katz offered to pay him to provide LPC's proprietary information to him. (Id.) After Keith Hernandez was demoted to a position in collections, he agreed to Katz's offer. (Id. ¶ 3.) Beginning in fall 2008 Keith Hernandez provided LPC's customer-specific information to Katz, and Katz used that information to obtain renewals from existing LPC customers whose contracts—originally procured by other sales channels—were expiring. (Id. ¶¶ 3-6.) In exchange, Katz paid a percentage of the commissions he received from LPC to Keith Hernandez. (Id.)

After Keith Hernandez was terminated by LPC in summer 2009 (DH Decl. ¶ 11), he allegedly conspired with Katz to continue to obtain LPC's customer-specific information from an LPC sales channel support representative, Yamil Moya ("Moya") (KH Decl. ¶ 7). When Keith Hernandez went to work for Katz at FES in January 2010, Moya gave Keith Hernandez his password to LPC's systems so that Keith Hernandez could access LPC's customer-specific information. (Id. ¶ 8.) Keith Hernandez used this access to continue providing customer-specific information to Katz. (Id. ¶¶ 9-11.)

Though the declarations and affidavits offered by the parties are sharply at odds as to some facts, Katz does not dispute that he received LPC customer-specific information from Keith Hernandez. (Katz Aff. ¶¶ 25-27.) Katz specifically denies that he received a USB drive containing customer-specific information on 1,500 LPC customers from Keith Hernandez (id. ¶ 32), but Keith Hernandez's averment (KH Decl. ¶ 6) is corroborated by the declaration of a former FES employee who claims to have seen Keith Hernandez giving Katz a USB drive (Razeq Decl. (Docket Entry # 33-3) ¶ 2). In contrast with his specific denial that he received a USB drive from Keith Hernandez (Katz Aff. ¶ 32 ("*This is untrue*.")), Katz does not specifically deny in his Affidavit that Katz paid Keith Hernandez a total of $40,000 for LPC's customer-

7

specific information.  (But compare Compl. ¶ 45 with Answer (Docket Entry # 27) ¶ 45; see also KH Decl. ¶ 12.)  Instead, Katz's Affidavit is silent as to what he gave Keith Hernandez in return for the customer-specific information he received.  Katz defends this arrangement by stating that he only used the information he obtained from Keith Hernandez to renew expiring contracts for LPC.  (Katz Aff. ¶¶ 25-29.)  While Katz claims that he believed this would help LPC, it is also clear that he desired the commissions that he would obtain from renewing these customers. (Id. ¶ 26 ("I saw [Keith Hernandez's] offer as benefitting Liberty Power, as well as myself.").)

Despite the conflicting evidence, the court finds that Plaintiff has established that Defendants likely paid at least one LPC employee kickbacks in order to obtain customer-specific data that are likely trade secrets.  "If a trade secret is acquired through conduct that is itself a tortious or criminal invasion of the trade secret owner's rights, the acquisition ordinarily will be regarded as improper."  Restatement (Third) of Unfair Competition § 43 cmt. c (1995); see also Restatement (First) of Torts § 759 cmt. c (1939) ("Among the means which are improper are theft, trespass, bribing or otherwise inducing employees or others to reveal the information in breach of duty . . . .").  Plaintiff has established that Defendants would not have been given access to the customer data had they not bribed an LPC employee to obtain it.  Therefore, Plaintiff has established that Defendants discovered its trade secrets through "improper means."[2] Faiveley, 559 F.3d at 117.

Consequently, Plaintiff is likely to succeed on the merits of its claim that Defendants misappropriated its trade secrets.

---

[2] Katz's alleged conduct was not merely "improper," it may have been criminal.  See N.Y. Penal Law § 180.03 ("A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit conferred or offered or agreed to be conferred exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars.").

8

### C. Irreparable Harm

Plaintiff contends that unless Defendants are enjoined, Defendants will use LPC's customer information to solicit LPC's customers and deliver them to other suppliers, harming LPC through lost contracts and damaging its relationships with its other sales channels. (Pl.'s Mem. at 15.) In support of this argument, Plaintiff points to statements made by Katz in which he stated his intent to move customers from LPC to its competitors. (KH Decl. ¶ 13; Razeq Decl. ¶¶ 4-5.) Katz neither admits nor denies that he made the statement referred to by Keith Hernandez, but argues that Plaintiff's claim of harm is speculative (Def. Mem. at 9), and argues that even if he did move LPC's customers to other suppliers, the harm would be compensable by an award of money damages (id. at 11).

"To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Faiveley, 559 F.3d at 118 (internal quotation marks omitted). In this analysis "the court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010) (quoting eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006)). "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." Salinger, 607 F.3d at 81; see also Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would

produce an indeterminate amount of business in years to come."); Tom Doherty Assocs. v. Saban Entertainment, Inc., 60 F.3d 27, 38 (2d Cir. 1995) ("[I]rreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial.").

Plaintiff simply fails to explain why it will suffer *irreparable* harm if the court does not issue a preliminary injunction preventing Defendants from using Plaintiff's trade secrets to solicit Plaintiff's customers.³ Plaintiff asserts that "[t]he evidence of Defendants' misappropriation alone warrants a finding of irreparable harm, as the value of Liberty Power's Proprietary Information, once lost, can never be regained or measured." (Pl.'s Mem. at 14-15.) Plaintiff's argument for a rebuttable presumption of harm is based on a dictum in the Second Circuit's opinion in Faiveley. (See Pl.'s Reply Mem. (Docket Entry # 33) at 2.) In Faiveley the Second Circuit clarified that no "presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated," but allowed that "[a] rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." 559 F.3d at 118. The Faiveley court reasoned that

> [w]here a misappropriator seeks only to use those secrets-without further dissemination or irreparable impairment of value-in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the

---

³ Plaintiff's proposed order also requires that, among other things: Defendants refrain from even contacting customers who appear on the lists misappropriated by Defendants; Defendants provide a list of people who have received the trade secret information; Defendants return all of the trade secret information; and that Defendants pay for a forensic consulting firm to inspect Defendants' computer systems to eradicate any trace of the information. (See Pl.'s Second Proposed Order (Docket Entry # 24-3).) Plaintiff's briefs provide no explanation why these additional specific forms of relief are necessary to prevent it from suffering actual and imminent harm "that cannot be remedied if a court waits until the end of trial to resolve the harm." Faiveley, 559 F.3d at 118. Consequently, this Memorandum and Order addresses only whether the court should issue an injunction preventing Defendants from using Plaintiff's trade secrets to solicit Plaintiff's customers.

10

originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

Faiveley, 559 F.3d at 118-19.

Plaintiff does not adequately explain why it should benefit from the distinction drawn by the Faiveley court's dictum; but even if it did, the Second Circuit's more recent decision in Salinger calls into question the viability of *any* presumption of irreparable harm. In eBay, Inc. v. MercExchange, LLC, the Supreme Court considered an appeal from a decision of the Federal Circuit reversing a decision of the District Court for the Eastern District of Virginia denying a motion for permanent injunctive relief following a finding of patent infringement, "applying its general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." 547 U.S. 388, 391 (2006) (internal quotation marks omitted). The Supreme Court reversed, holding that both the District Court and the Federal Circuit erred when they replaced traditional equitable considerations with categorical rules determining whether an injunction should issue following a determination of patent infringement. Id. at 394 ("Just as the District Court erred in its categorical denial of injunctive relief, the Court of Appeals erred in its categorical grant of such relief."). In Salinger the Second Circuit extended eBay's reasoning to preliminary injunctions in copyright cases, and indicated that the Supreme Court's repudiation of the use of "categorical" or "general" rules in applying the injunction standard is more broadly applicable than patent and copyright cases. See Salinger, 607 F.3d at 78 n.7 ("[A]lthough today we are not called upon to extend eBay beyond the context of copyright cases, we see no reason that eBay would not apply with equal force to an injunction in *any* type of case") (emphasis in original). Consequently, the court holds that under the Second Circuit's reasoning in Salinger, no presumption of irreparable harm applies in cases where a plaintiff has established that the defendant has likely misappropriated trade secrets. After Salinger and Faiveley, a trade secrets

11

plaintiff must establish on a case-by-case basis that there is an actual or imminent risk that it will suffer irreparable harm in the absence of a preliminary injunction.

The lone argument in Plaintiff's brief suggesting a reason why it will suffer irreparable harm is a quote from Markovits v. Venture Info Capital, Inc., 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001). In Markovits, Judge Sweet held that the harm that would result from failing to enjoin a former employee from violating a non-compete agreement was "simply unquantifiable." Id. Unlike the movants in Markovits, LPC has not argued that it is entitled to preclude Defendants from competing with it at all, just that Defendants should not be permitted to use its trade secrets to do so. According to Plaintiff, Defendants stole trade secret information only with respect to a finite—albeit large—number of customers. (See Bodine Decl. (Docket Entry # 33-1) ¶ 2 (stating that Defendants acquired trade secrets information with respect to approximately 4,630 current and former LPC customers, 2,845 of which were active customers at the time Plaintiff filed the action, and 2,365 of which were LPC customers as of October 15, 2010).) Thus the difficulty of calculating the harm of Defendants' competition with Plaintiff in the market *generally* is simply not a concern that is present in this case.

The harm Plaintiff has alleged in this case is the possibility that Defendants will use its trade secrets to undercut its contracts with a defined subset of its current and former customers and move them to competing electricity suppliers. Even if the court finds that Plaintiff has shown that there is an actual and imminent risk that Defendants will use Plaintiff's trade secrets to do this, the harm that would result is measureable and compensable through an award of damages after trial. Indeed, Plaintiff has calculated the potential renewal value of the contracts between it and the customers about whom Defendants obtained Plaintiff's proprietary information. (See Pl.'s Mem. at 13.) At trial, Plaintiff would be able to offer evidence

establishing how many customers it lost due to Defendants' misappropriation of its trade secrets, and could recover damages to compensate it for this harm.

Accordingly, Plaintiff has failed to carry its burden to show that it will be irreparably harmed in the absence of a preliminary injunction.

### III. CONCLUSION

While Plaintiff has established that it will likely succeed on the merits of its claim of misappropriation of trade secrets, it has not shown that there is an actual or imminent risk of harm "that cannot be remedied if [the] court waits until the end of trial to resolve the harm." Faiveley, 559 F.3d at 118. Therefore, Plaintiff's motion for a preliminary injunction is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
January 26, 2011

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge